**UNITED STATES DISTRICT COURT**
**SOUTHERN DISTRICT OF NEW YORK**
-----------------------------------------------------------x
ORLANDO VEGA,

                              Plaintiff,

                -against-

ANDREW M. SAUL, Commissioner of Social
Security,[1]

                          Defendant.
-----------------------------------------------------------x

No. 19-CV-1118 (OTW)

**OPINION AND ORDER**

**ONA T. WANG, United States Magistrate Judge:**

### I.    Introduction

Plaintiff Orlando Vega brings this action pursuant to section 205(g) of the Social Security

Act, 42 U.S.C. § 405(g), seeking judicial review of a final decision of the Commissioner of Social

Security ("Commissioner") denying his application for disability insurance benefits ("DIB").

Plaintiff moved for judgment on the pleadings pursuant to Rule 12(c) of the Federal Rules of

Civil Procedure. (ECF 10). The Commissioner cross-moved for judgment on the pleadings

pursuant to Rule 12(c) of the Federal Rules of Civil Procedure. (ECF 12). For the reasons set

forth below, Plaintiff's Motion for Judgment on the Pleadings is **GRANTED**, the Commissioner's

Cross-Motion for Judgment on the Pleadings is **DENIED**, and the case is remanded for further

proceedings pursuant to 42 U.S.C. § 405(g).

---

[1] Andrew M. Saul is now the Commissioner of Social Security. Pursuant to Federal Rule of Civil Procedure 25(d), the
Court substitutes Andrew M. Saul for Defendant "Commissioner of Social Security."

II.   **Statement of Facts**[2]

A.   **Procedural Background**

Plaintiff applied for DIB on October 14, 2015. (Tr. 15, 67, 68). Plaintiff alleged a disability

onset date of April 19, 2015, listing a back injury as the result of a car accident (Tr. 15, 67, 68,

69, 166). The Commissioner initially denied Plaintiff's applications on December 18, 2015.

(Tr. 15). After Plaintiff requested a hearing before an Administrative Law Judge ("ALJ"), Tr. 84-

87, ALJ David Suna conducted a hearing on December 20, 2017, at which both Plaintiff,

represented by counsel, and vocational expert Sakinah Malik testified. (Tr. 26-66). On February

22, 2018, ALJ Suna found that Plaintiff was not disabled. (Tr. 26-66). On December 10, 2018, the

Appeals Council subsequently denied Plaintiff's request for review of ALJ Suna's decision,

rendering the Commissioner's decision final. (Tr. 1-3). Plaintiff then filed an action for review in

this Court on February 5, 2019. (ECF 1).

B.   **Social Background**

Plaintiff was born in 1969 and currently lives with his mother in the Bronx, New York.

(Tr. 35, 148). Plaintiff has a high school diploma but no college education or vocational training.

(Tr. 37). From 1997 until 2015 Plaintiff worked as a doorman for large residential buildings in

New York City. (Tr. 31-32, 46). In this position he was on his feet 95% of the time and lifted

objects that were heavier than 20 pounds. (Tr. 33). He would also pick up packages, transport

suitcases, let in guests, hail cabs, and handle lobby mats. (Tr. 32-33, 186).

---

[2] Only the facts relevant to the Court's review are set forth here. Plaintiff's medical history is contained in the administrative record that the Commissioner filed in accordance with 42 U.S.C. § 405(g). (*See* Administrative Record, dated June 3, 2019, ECF 9 ("Tr.")).

### C.  Medical Background

In August 2013, Plaintiff was involved in an automobile accident. (Tr. 40). Plaintiff was unable to work for three months following the accident, but returned to work thereafter. (Tr. 41). To alleviate the pain experienced from the accident, Plaintiff was given approximately ten epidural steroid injections between the period of August 2013 and April 2015. (Tr. 41). Plaintiff's treating physician also prescribed Plaintiff muscle relaxants for pain management. (Tr. 41). Despite these pharmacological remedies, Plaintiff testified that the pain made it impossible for him to work. (Tr. 42).

On April 19, 2015 – Plaintiff's alleged onset date ("AOD") – Plaintiff underwent a lumbar laminectomy and fusion with instrumentation[3] at the L5-S1 level.[4] (Tr. 252-253). Plaintiff still experienced pain while sleeping and walking. (Tr. 42). To treat this pain, Plaintiff received epidural steroid injections, engaged in physical therapy, and took prescription pain medications – gabapentin, oxycodone, and hydrobenzine. (Tr. 42-43). Although the injections would mitigate pain for roughly three weeks at a time, their efficacy would wear off. (Tr. 43). The pain medications, which Plaintiff takes three to four times daily, also cause drowsiness. (Tr. 43-44). Plaintiff experiences muscle spasms three to four times per week, which can last several hours at a time. (Tr. 46-47). In order to accommodate his pain and discomfort, Plaintiff alternates between sitting and standing frequently, as evidenced by his standing during trial and sitting awkwardly on his side. (Tr. 40, 44-45, 54). Because of his pain, Plaintiff has not looked for work since his AOD. (Tr. 40).

---

[3] Lumbar laminectomies are performed in order to relieve pain caused by degenerative conditions of the spine.

[4] The L5-S1 spinal motion segment, also called the lumbosacral joint, is the transition region between the lumbar spine and sacral spine in the lower back.

Prior to his injury, Plaintiff enjoyed walking, biking, and kayaking but can no longer participate in his hobbies uninterrupted or without pain. (Tr. 178). Plaintiff drives twice weekly to and from doctors' appointments, but avoids taking trains or buses because his injuries require seating, which public transportation does not guarantee. (Tr. 36-37, 44). In his initial application, Plaintiff stated that standing leads to back pain and cramping in the back of his legs. (Tr. 182). He also stated that he experiences pain with lifting, carrying, walking, kneeling, and squatting. (Tr. 182). Plaintiff also stated he could walk one or two miles but would then have to rest for forty minutes. (Tr. 183). His mother performs all housework, including grocery shopping, cleaning, cooking, and laundry. (Tr. 45-46).

### D.  Medical Record

#### 1.  Orthopedic Surgeon Alok Sharan, M.D. (Pre-AOD)

Plaintiff first saw Dr. Alok Sharan on September 5, 2013, roughly a month after the car accident that led to his injuries. (Tr. 227). Plaintiff described neck pain, but no pain in his arms nor any tingling or numbing sensations to Dr. Sharan. (Tr. 227). Plaintiff also denied seeking any active treatment since the accident. (Tr. 227). Dr. Sharan diagnosed Plaintiff with whiplash, ordered a course of physical therapy, and prescribed Percocet and Valium. (Tr. 227-28).

A month later, on October 8, 2013, Plaintiff returned for a follow-up. (Tr. 229). Plaintiff stated that physical therapy had been helping; his orthopedic test showed the same positive results. (Tr. 229). Dr. Sharan ordered a continuation of physical therapy. (Tr. 229).

One year later, on November 4, 2014, Plaintiff returned complaining of back pain. (Tr. 230). Dr. Sharan diagnosed Plaintiff with lumbar degenerative disc disease and referred him to Pain Management Specialist Sireen Gopal, M.D. for further treatment. (Tr. 231).

### 2. Pain Management Specialist Sireen Gopal, M.D. (Part I – Pre-AOD)

Dr. Sireen Gopal treated Plaintiff from September 2013 through September 2017, a roughly nineteen-month period pre-dating his AOD in April 2015. (Tr. 19).

After Plaintiff's car accident but before the AOD – from September 2013 through March 2015 – Plaintiff received epidural steroid injections from Dr. Gopal. (Tr. 350-413, 523-34). Plaintiff estimated receiving roughly ten injections over this period. (Tr. 41).

Dr. Gopal's notes during this time indicated that Plaintiff experienced consistent pain that resulted in moderate limitations. (Tr. 19).[5] These results remained consistent at consultations through at least October 2014. (Tr. 419, 452).

### 3. Orthopedic Surgeon Christian Brotea, M.D. (2015-2016)

#### a. Pre-AOD (February 2015-March 2015)

Plaintiff first consulted Dr. Christian Brotea on February 10, 2015 (Tr. 19, 249-251). During this consultation, Dr. Brotea documented lumbo-sacral tenderness, a decreased range of motion, and a positive straight leg raising at 45 degrees. (Tr. 250). Dr. Brotea observed a likely S1 radiculopathy (nerve root compression) and posited that Plaintiff was a candidate for a lumbar laminectomy with fusion and instrumentation. (Tr. 250-51).

Because Dr. Brotea had stated that an MRI was a prerequisite to the laminectomy, Plaintiff received an MRI on February 25, 2015. (Tr. 235). Dr. Brotea diagnosed Plaintiff with a

---

[5] One exam in October 2013 suggested reduced pains levels. (Tr. 19, 378). Another exam in January 2014 revealed limited cervical range of motion in lateral rotation in both directions and myofascial trigger points in the upper trapezius area. (Tr. 19). However, Plaintiff also had negative Spurling's, Babinski, and Hoffman tests; normal motor strength in the upper and lower extremities; mildly limited range of motion in the lumbar spine; and, negative straight leg raising. (Tr. 19-20, 353-354). In June and August 2014, Dr. Gopal noted that Plaintiff had reduced pain as a result of physical therapy. (Tr. 20, 440, 458).

bulging disc as opposed to a herniated disc. (Tr. 235). Dr. Brotea did, however, remark that the findings were "not significantly changed compared to previous examinations." (Tr. 235).

On March 23, 2015 Plaintiff visited Dr. Brotea for a preoperative visit. (Tr. 252-53). Dr. Brotea summarized Plaintiff's injuries by diagnosing: (1) a disc herniation at L5-S1 associated with degenerative disc disease, (2) disc space narrowing, and (3) radicular impingement. (Tr. 252). In approving Plaintiff for the laminectomy, Dr. Brotea noted that Plaintiff's back pain was multifactorial and that Plaintiff may still experience significant pain even if the operation was successful. (Tr. 252).

### b. Post-AOD (April 2015-January 2016)

Dr. Brotea performed a lumbar laminectomy with fusion and instrumentation on Plaintiff on April 19, 2015 (Plaintiff's AOD). (Tr. 19, 263-65).

Six weeks after the operation, Plaintiff returned for a follow-up visit. (Tr. 254). Although Dr. Brotea opined that Plaintiff was doing relatively well, Plaintiff expressed continued pain in his lower back through his buttocks and thighs. (Tr. 254). Dr. Brotea suggested Plaintiff begin a "gentle course of physical therapy." (Tr. 254).

Another six weeks later, Dr. Brotea documented improvement in radicular pain, but also noted continued pain. (Tr. 255-56). While a physical examination did not reveal any focal neurological deficits, radiculopathy, or myelopathy, Dr. Brotea observed lower back pain and significant tenderness consistent with trochanteric bursitis (inflammation of the hip joint). (Tr. 255-56). Dr. Brotea directed Plaintiff to continue physical therapy. (Tr. 256).

In both October 2015 and January 2016, Dr. Brotea reiterated these findings. (Tr. 257-58, 259-60). In January 2016, Dr. Brotea informed Plaintiff that he could resume normal

6

activities, should continue physical therapy, take pain medication, and recommended him to an internal medicine physician for further pain treatment. (Tr. 260).

### 4. Pain Management Specialist Sireen Gopal, M.D. (Part II – Post-AOD)

Dr. Gopal continued to treat Plaintiff post-AOD. (Tr. 19).

Plaintiff's first post-operative visit to Dr. Gopal occurred roughly one month after the surgery. (Tr. 520). At first, Plaintiff experienced moderate pain. (Tr. 520). Over the following two months, Plaintiff reported increasing pain. (Tr. 515, 517, 520). Dr. Gopal noted tenderness along with bilateral lumbar facet joints and limited range of motion in the lumbar spine. (Tr. 515). Dr. Gopal recommended physical therapy and physical therapeutic exercises. (Tr. 516). By early July 2015, Dr. Gopal identified Plaintiff's injuries as potentially resulting from Post Laminectomy Syndrome ("PLS").[6] (Tr. 515-16). Later that month Dr. Gopal administered a trigger point injection to reduce pain and facilitate therapeutic exercises. (Tr. 512). In August 2015, Dr. Gopal noted mild improvements in pain attributable to Plaintiff's therapy. (Tr. 498).

On October 9, 2015, Dr. Gopal noted that Plaintiff had mild improvement in back pain with physical therapy but still exhibited positive tenderness at the right paraspinals, limited range of motion due to pain, fair lumbar stability, normal strength except for some reduced strength (4/5) of the abdominals and lumbar paraspinals, and a mildly antalgic gait. (Tr. 484).

A February 2016 consultation with Dr. Gopal recorded tenderness of the left paraspinals and limited flexion and extension of the back. (Tr. 270). Dr. Gopal again suggested physical therapy as a treatment, but provided a trigger point injection to relieve pain. (Tr. 270, 280).

---

[6] PLS is defined as persistent pain in the back following back surgery. (*See* ECF 11 at 7 n.7).

In March 2016, Dr. Gopal's office noted left lumbar facet tenderness, limited range of motion of the lumbar spine, negative straight leg raise testing, no overt evidence of instability, normal strength bilaterally of the upper and lower extremities, and a normal sensory exam. (Tr. 267).

By August 2016 Plaintiff reported improved pain to Dr. Gopal, noting a six out of ten on a pain scale. (Tr. 585). Dr. Gopal diagnosed Plaintiff with radiculopathy in the lumbosacral (lower back) region. (Tr. 585).

Plaintiff returned, however, in September 2016 complaining of stiffness in the lower back with occasional pain. (Tr. 564). Plaintiff received another trigger point injection. (Tr. 557).

Plaintiff returned in November 2016 presenting the same symptoms and receiving the same diagnoses from Dr. Gopal. (Tr. 542). Dr. Gopal encouraged Plaintiff to continue physical therapy. (Tr. 542).

Plaintiff visited Dr. Gopal's office in January 2017 and complained of worsening back pain and right knee pain. (Tr. 345). Plaintiff articulated that pain increased with any form of activity. (Tr. 345). Examination revealed joint tenderness at the L4-L5 region and limited range of motion of the lumbar spine. (Tr. 345). However, Plaintiff also exhibited normal gait, negative straight leg raise test, no overt evidence of instability, normal strength of the bilateral and upper and lower extremities, and normal sensation. (Tr. 345). Although Plaintiff's right knee had no swelling, palpitation revealed right medial joint line tenderness and a positive patellar grind test; visual inspection suggested arthritic changes. (Tr. 346). Plaintiff's March & April 2017 consultations revealed similar outcomes. In March, Plaintiff again complained of lower back

pain that radiated down the back of the legs, this time affecting the left knee. (Tr. 334). Plaintiff received transforaminal epidural injections to control his radicular pain.

In August 2017, Plaintiff received an epidural injection and reported 60% improvement in pain. (Tr. 302). Physical therapy, rest, and medications relieved some of Plaintiff's pain. (Tr. 298). However, prolonged sitting, standing, and walking, getting up from seated positions, climbing stairs, and any other activity further aggravated his pain. (Tr. 298).

### 5. Consultative Examiner & Internal Medicine Specialist Dipti Joshi, M.D. (December 2015)

At the behest of the SSA, Plaintiff visited Dr. Dipti Joshi on December 14, 2015. (Tr. 236-39). Plaintiff complained of upper and lower back pain, registering an eight out of ten on a pain scale. (Tr. 236). Plaintiff described sharp pain radiating up his neck, achiness around the neck area, and lower back pain that radiates into the legs and feet. (Tr. 236). Plaintiff described engaging in several daily activities including, cooking, cleaning, laundry, shopping, showering, bathing, dressing himself, watching television, listening to radio, reading, and socializing with friends. (Tr. 236). A visual examination was positive and recorded no acute distress. (Tr. 236). Plaintiff had a normal cervical spine and full range of bilateral motion in the shoulders, elbows, forearms, and wrists. (Tr. 237). However, Plaintiff's lumbar spine, hips, and knees exhibited more limited ranges of motion. (Tr. 237-38). Plaintiff had no sensory or strength deficits in the upper and lower extremities and no muscle atrophy. (Tr. 238).

Dr. Joshi diagnosed Plaintiff with: (1) low back pain radiating into the feet causing cramping with prolonged positioning in the lower extremities, (2) neck pain and thoracic back pain radiating up into the neck, and (3) a history of back surgery. (Tr. 238). Dr. Joshi opined that Plaintiff had moderate limitations with bending. (Tr. 238). He also suggested that Plaintiff

should avoid heavy lifting, carrying, pushing, pulling, and prolonged walking, climbing, and standing. (Tr. 238). He did not opine on Plaintiff's ability to sit. (Tr. 238).

### E.   Non-Medical Evidence

#### 1.   Plaintiff's Testimony

Plaintiff testified before ALJ Suna on December 20, 2017. (Tr. 26-66). The relevant portions of Plaintiff's testimony are covered above, *see supra* § II.C. Namely, Plaintiff testified that his pain – in conjunction with the side effects of his medication – make it impossible for him to work. He further testified that his mobility is reduced to such an extent that he engages in no homemaking responsibilities and rarely leaves his house.

#### 2.   Vocational Expert ("VE") Testimony

At the ALJ hearing, VE Sakinah Malik testified via telephone. (Tr. 47-62). Ms. Malik identified Plaintiff's past relevant work as a doorkeeper or doorman, which was unskilled work that required medium exertion. (Tr. 48). ALJ Suna asked Ms. Malik to assume a hypothetical individual of Plaintiff's age, education, and past work experience who had the residual functional capacity ("RFC") for light exertional work. (Tr. 48).

ALJ Suna added the following limitations: could occasionally push and pull; could occasionally climb ramps and stairs; could never climb ladders, ropes, or scaffolds; could occasionally balance, stoop, kneel, and crouch; could never crawl; should have no exposure to unprotected heights; and would need normal breaks and be off-task five percent of the time in an eight-hour workday. (Tr. 48). Ms. Malik testified that such an individual would be unable to perform Plaintiff's past work as a doorkeeper. (Tr. 48-49). Ms. Malik did testify, however, that

such an individual could find other work in the national economy. (Tr. 49). These were the light, unskilled jobs of ticket taker, hand packer and packager, and mail clerk. (Tr. 49).

ALJ Suna limited this individual to performing only sedentary work. (Tr. 50). Ms. Malik testified that such an individual could perform the sedentary, unskilled jobs of order clerk (food and beverage), surveillance system monitor, and eyeglass polisher. (Tr. 50-51).

ALJ Suna limited the first individual (i.e., the light work individual) to require alternations between sitting and standing every thirty to sixty minutes with a five- to ten-minute change of position, while remaining on-task. (Tr. 51). Under these limitations, according to Ms. Malik, such an individual would be able only to perform the work of ticket taker. (Tr. 51). However, this individual would also be able to perform the work of parking lot attendant and storage facility rental clerk. (Tr. 51).

ALJ Suna then limited the second individual (i.e., the sedentary work individual) to require these sit/stand alternations. (Tr. 52). Under these limitations, according to Ms. Malik, such an individual would be able only to perform the work of order clerk, food and beverage. (Tr. 52). However, this individual would also be able to perform the work of cashier, gambling and mail sorter. (Tr. 54-55).

In her testimony, Ms. Malik noted that the Dictionary of Occupational Titles ("DOT") does not include an explicit sit/stand dimension referenced by ALJ Suna. (Tr. 55-56). To answer questions related to those limitations, Ms. Malik used her personal experience. (Tr. 56). Similarly, the DOT does not reference off-task time explicitly. (Tr. 56). To answer these questions, Ms. Malik used the Bureau of Labor Statistics ("BLS") to arrive at her conclusions. (Tr. 56).

Under examination by Plaintiff, Ms. Malik noted that unskilled and semi-skilled workers would be allowed to miss no more than one day per month according to the BLS. (Tr. 57). She noted that she had not personally observed some of the jobs she testified Plaintiff could perform and that some of her recommendations were based on job descriptions from online employment websites. (Tr. 57). She also noted that she was uncertain if at least one of the jobs she recommended – gambling cashier – could be performed with the sit/stand option. (Tr. 60).

### III.    Analysis

#### A.  Applicable Legal Principles

##### 1.  Standard of Review

A motion for judgment on the pleadings should be granted if the pleadings make it clear that the moving party is entitled to judgment as a matter of law. However, the Court's review of the Commissioner's decision is limited to an inquiry into whether there is substantial evidence to support the findings of the Commissioner and whether the correct legal standards were applied. Substantial evidence is more than a mere scintilla but requires the existence of "relevant evidence as a reasonable mind might accept as adequate to support a conclusion," even if there exists contrary evidence. *See Halloran v. Barnhart*, 362 F.3d 28, 31 (2d Cir. 2004); *see also Alston v. Sullivan*, 904 F.2d 122, 126 (2d Cir. 1990). This is a "very deferential standard of review." *Brault v. Soc. Sec. Admin., Comm'r*, 683 F.3d 443, 448 (2d Cir. 2012). The Court may

not determine *de novo* whether Plaintiff is disabled but must accept the ALJ's findings unless "a reasonable factfinder would *have to conclude otherwise*." *Id*. (citations omitted).

### 2.   Determination of Disability

To be awarded disability benefits, the Social Security Act requires that one have the "inability to engage in any substantial gainful activity by reason of any medically determinable physical or mental impairment which can be expected to result in death or which has lasted or can be expected to last for a continuous period of not less than 12 months." 42 U.S.C. § 423(d)(1)(A); *see also* 20 C.F.R. § 416.905(a). The ALJ makes this determination through a five-step evaluation process, for which the burden rests on the Plaintiff for the first four steps and only after all four steps are satisfied does the burden then shift to the Commissioner for the final step. 20 C.F.R. § 416.920; *see also Estrella v. Berryhill*, 925 F.3d 90, 94 (2d Cir. 2019).

First, the ALJ must determine that Plaintiff is not currently engaged in substantial gainful activity. Second, the ALJ must find that Plaintiff's impairment is so severe that it limits her ability to perform basic work activities. Third, the ALJ must evaluate whether Plaintiff's impairment falls under one of the impairment listings in 20 C.F.R. Pt. 404, Subpart P, Appendix 1 ("Listings") such that she may be presumed to be disabled. Absent that, the ALJ must then determine the claimant's RFC, or her ability to perform physical and mental work activities on a sustained basis. Fourth, the ALJ then evaluates if Plaintiff's RFC precludes her from meeting the physical and mental demands of her prior employment. If Plaintiff has satisfied all four of these steps, the burden then shifts to the Commissioner to prove that based on Plaintiff's RFC, age, education, and past work experience, Plaintiff is capable of performing some other work that exists in the national economy.

### 3. Treating Source Rule

The "treating source rule," also known as the "treating physician rule," is a series of

regulations set forth by the Commissioner in 20 C.F.R. § 404.1527 detailing the weight to be

accorded a treating source's opinion.[7] A treating source's opinion will be given controlling

weight if it is "well-supported by medically acceptable clinical and laboratory diagnostic

techniques and is not inconsistent with the other substantial evidence in . . . [the] record."

20 C.F.R. § 404.1527(c)(2); *see also Estrella*, 925 F.3d at 95-98; *Schisler v. Sullivan*, 3 F.3d 563,

567 (2d Cir. 1993).

At step one, the ALJ must decide whether the opinion is "well-supported by medically

acceptable clinical and laboratory diagnostic techniques and is not inconsistent with the other

substantial evidence in the case record." *Estrella*, 925 F.3d at 95-98. If the treating source's

opinion meets these criteria, then it is "entitled to controlling weight." *Id.* Otherwise, the ALJ

must proceed to step two and "determine how much weight, if any, to give" the opinion. *Id.* At

step two, the ALJ must "*explicitly consider*" the following factors derived from *Burgess v. Astrue*,

537 F.3d 117 (2d Cir. 2008) (emphasis added): "(1) the frequency, length, nature, and extent of

treatment; (2) the amount of medical evidence supporting the opinion; (3) the consistency of

the opinion with the remaining medical evidence; and (4) whether the physician is a specialist."

*Estrella*, 925 F.3d at 95-96. At both steps one and two, "the ALJ must give good reasons in its

---

[7] Although not relevant here, the Court notes that the regulations governing the "treating physician rule" recently changed as to claims filed on or after March 27, 2017. *See* 20 C.F.R. §§ 404.1527, 404.1520c; Revisions to Rules Regarding the Evaluation of Medical Evidence, 82 F.R. 5844-01, 2017 WL 168819, at *5844, *5867-68 (Jan. 18, 2017); a*ccord Cortese v. Comm'r of Social Sec.*, 16-CV-4217 (RJS), 2017 WL 4311133, at *3 n.2 (S.D.N.Y. Sept. 27, 2017).

notice of determination or decision for the weight it gives the treating source's medical

opinion." *Id.* at 96.

"An ALJ's failure to 'explicitly' apply the *Burgess* factors when assigning weight at step

two is a procedural error." *Estrella*, 925 F.3d at 96 (citing *Selian v. Astrue*, 708 F.3d 409, 419-20

(2d Cir. 2013)). However, if "a searching review of the record" assures the Court "that the

substance of the treating physician rule was not traversed," the Court should

affirm. *Id.* (citing *Halloran*, 362 F.3d at 32). On the other hand, the Second Circuit has been clear

that it will "continue remanding when [it] encounter[s] opinions from ALJ's [sic] that do not

comprehensively set forth reasons for the weight assigned to a treating physician's

opinion." *Halloran*, 362 F.3d at 33.

### 4.  Duty to Develop the Record

"It is the rule in [the Second] [C]ircuit that 'the ALJ, unlike a judge in a trial, must . . .

affirmatively develop the record' in light of 'the essentially non-adversarial nature of a benefits

proceeding.'" *Pratts v. Chater*, 94 F.3d 34, 37 (2d Cir. 1996) (quoting Echevarria v. Sec'y of

*Health & Human Servs.*, 685 F.2d 751, 755 (2d Cir. 1982)); *see also* 20 C.F.R. §§ 404.1512(b),

416.912(b).

> "[T]he social security ALJ, unlike a judge in a trial, must on behalf of all claimants.
> . . affirmatively develop the record in light of the essentially non-adversarial
> nature of a benefits proceeding." Social Security disability determinations are
> "investigatory, or inquisitorial, rather than adversarial." "[I]t is the ALJ's duty to
> investigate and develop the facts and develop the arguments both for and against
> the granting of benefits."

*Moran v. Astrue*, 569 F.3d 108, 112-13 (2d Cir. 2009) (internal citations omitted; second

alteration in original). This duty exists even when the claimant is represented by counsel. *Id*.

This duty is "particularly important" when the plaintiff alleges a mental illness. *Hidalgo v. Colvin*, No. 12-CV-9009 (LTS) (SN), 2014 WL 2884018, at *4 (S.D.N.Y. June 25, 2014) ("This duty to develop the record is particularly important where an applicant alleges he is suffering from a mental illness[], due to the difficulty in determining 'whether these individuals will be able to adapt to the demands or 'stress' of the workplace.'" (quoting *Lacava v. Astrue*, No. 11-CV-7727 (WHP) (SN), 2012 WL 6621731 at *12 (S.D.N.Y. Nov. 27, 2012), *report and recommendation adopted*, 2012 WL 6621722 (Dec. 19, 2012)). While the ALJ may not need to supplement the record when the record already contains sufficient evidence, the ALJ must seek out additional evidence where there are "obvious gaps' in the administrative record." *Id*. (quoting *Rosa v. Callahan*, 168 F.3d 72, 79 n.5 (2d Cir. 1999)).

### B. The ALJ's Decision

ALJ Suna found that Plaintiff was not disabled. (Tr. 15-22). After finding that Plaintiff had not engaged in substantial gainful activity since the AOD, ALJ Suna found that Plaintiff suffered from the following severe impairment: degenerative disc disease status post lumbar laminectomy and fusion. (Tr. 17). ALJ Suna noted that Plaintiff's complaints of right knee pain and neck pain were not substantiated by objective test results that could establish a medically determinable impairment ("MDI"). (Tr. 17). At the third step, ALJ Suna found that Plaintiff's severe impairments did not meet any of the Listings such that he would be considered presumptively disabled under Appendix 1. (Tr. 17).

ALJ Suna then found that Plaintiff had the RFC to perform light work with the following limitations:

- Plaintiff can occasionally push and pull;

- Plaintiff can occasionally climb ramps and stairs;

- Plaintiff can never climb ladders, ropes, or scaffolds;

- Plaintiff can occasionally balance, stoop, kneel, and crouch;

- Plaintiff can never crawl;

- Plaintiff must avoid all exposure to unprotected heights;

- Plaintiff would need to be off-task 5% of the time in an 8-hour workday in addition to normal breaks;

- Plaintiff would need to alternate between sitting and standing every 30-60 minutes with a 5-10 minute change of position, while remaining on task.

(Tr. 18). In making this determination, ALJ Suna stated that he did not fully credit Plaintiff's reports regarding the intensity, persistence and limiting effects of his symptoms. (Tr. 18-19). Specifically, ALJ Suna concluded that Plaintiff's symptoms were not entirely consistent with the medical evidence and other evidence in the record. (Tr. 19).

In arriving at this conclusion, ALJ Suna relied heavily on consultative examiner Dr. Joshi's findings that Plaintiff had "moderate limitations." (Tr. 20). ALJ Suna also relied on Dr. Brotea's notes that Plaintiff was doing "relatively well" after the surgery. (Tr. 19). In particular, ALJ Suna emphasized that in May 2016, Dr. Brotea found no evidence of radiculopathy and that Plaintiff could resume normal activities. (Tr. 19). Finally, ALJ Suna relied on Dr. Gopal's exam notes, which also indicated moderate limitations. (Tr. 19). However, ALJ Suna gave Dr. Gopal's opinion evidence only partial weight. (Tr. 20). Namely, ALJ Suna did not adopt Dr. Gopal's opinion that Plaintiff would require "4-5 breaks per day lasting 15 minutes." (Tr. 20).

ALJ Suna went on to find that Plaintiff could not perform his past relevant work as a doorkeeper. (Tr. 20). After finding that Plaintiff was not disabled under the Medical-Vocational Guidelines, ALJ Suna relied on the VE's testimony to conclude that – with the limitations set

17

forth above – Plaintiff retained the RFC to perform the work of ticket taker, parking lot attendant, and storage facility rental clerk. (Tr. 21). ALJ Suna further supported his conclusion by stating that, even if the RFC were limited to sedentary work, Plaintiff could perform the work of food and beverage order clerk, gambling cashier, and mail sorter. (Tr. 21). ALJ Suna therefore deemed Plaintiff to be "not disabled" and ineligible for DIB.  (Tr. 22).

### C.  Analysis of the ALJ's Decision

Plaintiff argues the following: (1) the ALJ erred in not affording Dr. Gopal's opinion evidence sufficient weight; (2) the ALJ failed to account for Plaintiff's arthritic right knee in determining Plaintiff's RFC; (3) the ALJ inadequately considered Plaintiff's impairments resulting from the side effects of his medication; (4) the ALJ failed to account for the side effects of Plaintiff's medication in determining Plaintiff's RFC; (5) the ALJ inadequately addressed Plaintiff's limitations from his right knee pain; (6) the ALJ erred in failing to provide adequate support for Plaintiff's RFC. (ECF 11).

#### 1.  Treating Source Evidence

Plaintiff's first argument is that remand is warranted because ALJ Suna misapplied the treating source rule in assigning weight to Dr. Gopal's opinion. (ECF 11 at 12, 14). ALJ Suna gave "partial weight" to Dr. Gopal's opinion, stating:

> Dr. Gopal opined in a September 2017 report that the claimant can lift or carry up to 10 pounds, can stand/walk less than 2 hours a day, can walk 1 block before stopping to rest, can sit less than 2 hours per day, can never bend, squat, or climb, can occasionally reach, cannot manipulate hands and arms on a repetitive basis, cannot operate foot controls, and will need 4-5 breaks per day lasting 15 minutes (Exhibit 5F, pages 1-4). This opinion is given partial weight. The claimant has a documented lengthy treatment history for back pain but exam findings have indicated moderate findings and his MRI tests have indicated only mild degenerative changes. The severity of this opinion is also inconsistent with the claimant's observed abilities during the consultative examination with Dr. Joshi

and with the claimant's self-reported daily activities.

(Tr. 20).

The court evaluates ALJ Suna's decision to afford partial weight to Dr. Gopal's opinion evidence under the "good reasons" standard set forth by the Second Circuit. *See Schisler*, 3 F.3d at 568. Under this analysis, the ALJ need not "slavish[ly] recit[e]" the *Schisler* factors, but must provide "good reasons" for affording a treating physician's opinion with less-than-controlling weight. *Atwater*, 512 F. App'x at 70. For the reasons set forth below, ALJ Suna's articulation falls short of this standard.

ALJ Suna implicitly relied on *Schisler* factors (3), the medical support for the treating source's opinion, and (4), the consistently of the opinion with the record as a whole (especially compared with Dr. Joshi's consultative examination) in affording only partial weight to Dr. Gopal's opinion. To support his conclusion that Dr. Gopal's opinion is not supported by medical evidence, ALJ Suna stated that "exam findings have indicated moderate findings and his MRI tests have indicated only mild degenerative changes." (Tr. 20). ALJ Suna presumably relied on Plaintiff's MRI tests from July 2014 and February 2015, since neither ALJ Suna's decision, Tr. 15-22, nor Plaintiff's Motion, ECF 11, reference any other MRI tests conducted. (Tr. 234, 235). However, these tests both occurred *before* Plaintiff's AOD and were an attempt to assess the damage that would ultimately lead to Plaintiff's lumbar laminectomy. Further, it does not appear that Dr. Joshi used the MRI test results in arriving at his opinion. The Second Circuit has found that when MRIs are reviewed by treating sources, but not consultative examiners, an ALJ cannot use that information to discredit the treating source's opinion. *See Morgan v. Colvin*, 592 F. App'x 49, 50 (2d Cir. 2015) (finding that the treating source opinion

19

was traversed when record did not indicate that the consultative examiner reviewed the underlying MRIs and the ALJ did not reconcile the consultative examiner's and treating sources' s opinion). Therefore, ALJ Suna's use of the MRI test results to discredit the opinion evidence of treating source Dr. Gopal is not a "good reason" as defined by the Second Circuit, and therefore cannot be used to support his decision.

Beyond the MRI results, ALJ Suna more generally used Dr. Joshi's December 2015 examination as support for his decision to give partial weight to the more-recent September 2017 examination by Dr. Gopal. (Tr. 20). Dr. Joshi's assessment was eight months *after* Plaintiff's AOD, but Dr. Gopal's assessment took place three months *prior to* Plaintiff's testimony before ALJ Suna. (Tr. 20, 236-39). Dr. Gopal's assessment revealed more extreme limitations than those identified by Dr. Joshi. An ALJ, when providing less-than-controlling weight to a treating physician's opinion, can use medical evidence proffered by a consultative examiner. *See Camille v. Colvin*, 652 F. App'x 25, 27-28 (2d Cir. 2016). However, the Second Circuit has found that the ALJ must provide some rationale for providing a treating physician's opinion with less-than-controlling weight when the consultative examiner's opinion is one year older than that of the treating physician. *Morgan*, 592 F. App'x at 50. Because Dr. Joshi's opinion pre-dated Dr. Gopal's by almost two years, and because Plaintiff's condition fluctuated over the course of his claim, ALJ Suna did not provide "good reasons" for choosing to discount treating physician Gopal's opinion. Further, the records indicate that Plaintiff's symptoms were not consistent over time and across each of his three treating physicians. For instance, in June 2015 Plaintiff rated his pain nine out of ten on a pain scale. (Tr. 517). However, in August 2017, Plaintiff reported that his pain improved sixty percent. (Tr. 302). In fact, Plaintiff concedes this

point in his Motion for Judgment on the Pleadings, stating that Plaintiff's "complaints of back

pain wax and wane for the two years until the hearing without an apparent pattern or cause."

(ECF 11 at 7).

It might be the case that other *Schisler* factors support ALJ Suna's decision to discount

Dr. Gopal's opinion evidence. However, ALJ Suna neither explicitly nor implicitly discussed those

factors. *See Morgan*, 592 F. App'x at 50 ("In light of the deficiencies in the ALJ's findings [there

is a] need for a remand so the ALJ may set forth with greater clarity the reasons he gave little

weight to [treating source's] opinion."). Accordingly, remand is appropriate. In making this

decision this Court makes no evaluation of whether substantial evidence in the record *could*

support a discounting of Dr. Gopal's decision.[8]

### 2.  Inadequate Support for RFC

Plaintiff also contends that ALJ Suna's determination of Plaintiff's RFC is inadequately

supported by the record. (ECF 11 at 15-16, 19-20, 21-22). Namely, Plaintiff argues that "[t]here

is no nexus cited in the decision between the underlying evidence and the RFC found." (ECF 11

at 15). Plaintiff first contends that ALJ Suna failed to provide specific support for the limitations

on Plaintiff's RFC. Plaintiff suggests that ALJ Suna provided no justification for the 5% off-task

time and the moderate exertional limitations. Although these limitations might be justifiable

given Plaintiff's knee pain, the side effects of his medication, and other impairments uncovered

over the course of Plaintiff's treatment, Plaintiff contends that the ALJ failed to adequately

explain his decision and therefore any attempt to do so now would be an improper post-hoc

---

[8] Plaintiff contends that, had ALJ Suna assigned greater weight to Dr. Gopal's assessment, Plaintiff's RFC for concentration, limitations in attendance, and off-task time might result in a disability determination. (ECF 11 at 16).

rationalization. (ECF 11 at 19). Plaintiff next contends that ALJ Suna made an improper medical

determination in deciding that Plaintiff could perform work with a sit-stand option given that

no physician commented on Plaintiff's ability in that regard.

As mentioned above, ALJ Suna's failure to provide adequate justification for discounting

treating physician Dr. Gopal's opinion evidence is grounds for remand. For this reason, I do not

address whether ALJ Suna's RFC determination was supported by substantial evidence in the

record. On remand, ALJ Suna should be sure to include an explanation for his RFC

determination and / or support for discounting treating physician Dr. Gopal's opinion

evidence.[9]

---

[9] I do note, however, that although no doctor specifically opined on the limitations decided by ALJ Suna, that alone is not fatal if there is other evidence in the record to support the ALJ's conclusion. *See Monroe v. Comm'r of Social Sec.*, 676 F. App'x 5, 8 (2d Cir. 2017) (when a record "contains sufficient evidence from which an ALJ can assess the claimant's residual functional capacity, a medical source statement or formal medical opinion is not necessarily required.") (internal quotation marks and citations omitted); *Swiantek v. Comm'r of Soc. Sec.*, 588 F. App'x 82, 84 (2d Cir. 2015) (the absence of a medical source statement from claimant's treating physicians was not fatal to the ALJ's determination where there was an "extensive medical record" that "contained multiple psychological assessments" of Plaintiff's abilities).

**IV.    Conclusion**

For the foregoing reasons, Plaintiff's Motion for Judgment on the Pleadings is **GRANTED**,

and the case is remanded for further proceedings pursuant to 42 U.S.C. § 405(g). Accordingly,

Commissioner's Cross-Motion for Judgment on the Pleadings is **DENIED.**

**SO ORDERED**.


_____*s/*_____Ona T. Wang_____

Dated: October 9, 2020                                                    **Ona T. Wang**
    New York, New York                                       United States Magistrate Judge